1

**JASSY VICK CAROLAN** LLP
JEAN-PAUL JASSY, Cal Bar No. 205513
  jpjassy@jassyvick.com
MEGHAN FENZEL, Cal. Bar No. 324139
  mfenzel@jassyvick.com
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone:     310-870-7048
Facsimile:     310-870-7010

2

3

4

5

6

Attorneys for Moving Party Journalist
KENNETH JACOBY

7

8

R OB B ONTA
Attorney General of California
J ULIE A. M ALONE
Supervising Deputy Attorney General
V ICKIE P. W HITNEY
Deputy Attorney General
State Bar No. 145316
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7520
  Fax: (916) 322-8288
  E-mail: Vickie.Whitney@doj.ca.gov
*Attorneys for Responding Party*

9

10

11

12

13

14

15

16

17

18

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

19

20

KENNETH JACOBY,

21

                Moving Party,

22

        vs.

23

BOARD OF SUPERVISORS OF THE
UNIVERSITY OF LOUISIANA SYSTEM,

24

25

                Responding Party.

26

27

28

Case No. 2:23-mc-00403-KJM-AC

*Pending in the Middle District of Louisiana*,
*Case No. 3:22-cv-00338-BAJ-SDJ*

**JOINT STATEMENT REGARDING
DISCOVERY DISAGREEMENT
CONCERNING SUBPOENA TO
JOURNALIST KENNETH JACOBY**

# **TABLE OF CONTENTS**

**Page**

I.     DETAILS OF MEET AND CONFER EFFORTS..................................................1

II.    THE NATURE OF THE ACTION AND THE FACTUAL DISPUTES .............................2

III.   CONTENTIONS OF EACH PARTY AS TO EACH CONTESTED ISSUE AND
       MEMORANDUM OF EACH PARTY'S RESPECTIVE ARGUMENTS ..........................2

    A.   Kenneth Jacoby's Memorandum of Arguments and Legal Authorities.....................2

        1.   The Subpoena Seeks Unpublished Newsgathering Information Protected
           from Disclosure by the First Amendment ......................................................5

            a.   ULS Has Not Exhausted Alternative Sources....................................7

            b.   The Subpoena Is Cumulative with Other Discovery..........................9

            c.   The Requests Are Not "Clearly Relevant" to a Specific Issue
                in the Case ....................................................................................10

        2.   Jacoby's Newsgathering Information Is Also Protected Under Common Law
           .......................................................................................................... 11

        3.   Jacoby Is Further Protected Under California's Shield Law........................13

        4.   The Subpoena Would Impose an Undue Burden on a Non-Party
           Journalist .........................................................................................15

    B.   ULS Board's Memorandum of Arguments and Legal Authorities ..........................15

        1.   Overview of ULS's Position .......................................................15

        2.   Applicable Law -Federal Common Law Governs Production of Materials
           Pursuant to ULS's Subpoena.......................................................17

        3.   Jacoby Should Be Compelled to Produce Materials Pursuant to the
           Subpoena .........................................................................................18

            a.   The requested information is unavailable from other sources ..........22

            b.   The requested information is not cumulative................................. 23

            c.   The requested materials are clearly relevant to an important issue
                in this case ..................................................................................24

        4.   Summary of ULS's Position .......................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agster v. Maricopa Co.*,
  422 F.3d 836 (9th Cir.2005)...................................................................................17

*Baker v. F&F Investment*,
  470 F.2d 778 (2d Cir. 1972).............................................................................12, 14

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) ..................................................................................5, 6, 11

*Carey v. Hume*,
  492 F.2d 631 (D.C. Cir. 1974) ..............................................................................7

*Carushka, Inc. v. Premiere Products, Inc.*,
  No. CV 87 02356 DT (JRX), 1989 WL 253565 (C.D. Cal. Sep. 1, 1989) .......................8, 12

*Crowe v. County of San Diego*,
  242 F. Supp. 2d 740 (S.D. Cal. 2003) .......................................................9, 12, 22

*F.D.I.C. v. Fidelity & Deposit Co. of Maryland*,
  196 F.R.D. 375 (S.D. Cal. 2000)...........................................................................17

*F. Marc Schaffel Prods., LLC v. TMZ Prods., Inc.*,
  No. CV-10-01306-GHK, 2010 WL 11549388 (C.D. Cal. Dec. 16, 2010) ...........................7

*Gonzales v. NBC*,
  194 F.3d 29 (2d Cir. 1999)....................................................................................6

*Gorenc v. Salt River Project Agric. Improvement & Power District*,
  869 F.2d 503 (9th Cir. 1989)................................................................................12

*Harbert v. Priebe*,
  466 F. Supp. 2d 1214 (N.D. Cal. 2006) ..........................................................7, 17

*Holland v. Centennial Homes, Inc.*,
  22 Med. L. Rptr. 2270 (N.D. Tex. 1993) .............................................................10

*Jaffee v. Redmond*,
  518 U.S. 1 (1996) .........................................................................................11, 12

*Jane Doe v. Board of Supervisors of the University of Louisiana System, et al.*,
  No. 22-cv-00338-BAJ-SDJ ................................................................1, 15, 16, 17

*Jimenez v. City of Chicago*,
  733 F. Supp. 2d 1268 (W.D. Wash. 2010) ...........................................................5

*Krase v. Graco Children Prod., Inc.*,
  79 F.3d 346 (2d Cir. 1996) ..................................................................................10

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
  89 F.R.D. 489 (C.D. Cal. 1981) ........................................................7, 8, 12, 14

*Legal Voice v. Stormans Inc.*,
  738 F.3d 1178 (9th Cir. 2013)..............................................................................15

*McGarry v. Univ. of San Diego*,
    154 Cal. App. 4th 97 (2007).............................................................................13, 14, 15

*Mitchell v. Superior Court*,
    37 Cal. 3d 268 (1984)...................................................................................................13

*New Jersey v. Boiardo*,
    414 A.2d 14 (N.J. 1980).................................................................................................7

*New York v. Troiano*,
    11 Med. L. Rptr. 1896 (N.Y. Sup. Ct. 1985)..............................................................10

*New York Times Co. v. Superior Court*,
    51 Cal. 3d 453 (1990).........................................................................................13, 14, 15

*Nitsch v. DreamWorks Animation SKG Inc.*,
    2017 WL 930809 (N.D. Cal. Mar. 9, 2017) ................................................................15

*Playboy Enterprises, Inc. v. Superior Court*,
    154 Cal. App. 3d 14 (1984)....................................................................................14, 15

*Porter v. Dauthier*,
    No. CIV.A. No. 14-41-JWD-RLB, 2014 WL 6674468 (M.D. La. Nov. 25, 2014)..............18

*Shoen v. Shoen*,
    5 F.3d 1289 (9th Cir. 1993) (*Shoen I*) ..............................................................6, 7, 8

*Shoen v. Shoen*,
    48 F.3d 412 (9th Cir. 1995) (*Shoen II*)..............................3, 6, 7, 9, 10, 11, 18, 22, 23, 24, 25

*In re Stratosphere Corp. Secs. Litig.*,
    183 F.R.D. 684 (D. Nev. 1999) .....................................................................................8

*United States v. Burke*,
    700 F.2d 70 (2nd Cir 1983).........................................................................................10

*United States v. La Rouche Campaign*,
    841 F.2d 1176 (1st Cir. 1988) .......................................................................................6

*United States v. Cuthbertson*,
    651 F.2d 189 (3d Cir. 1981) ..........................................................................................7

*United States v. Fields*,
    663 F.2d 880 (9th Cir. 1981) .......................................................................................10

*In re Willon*,
    47 Cal. App. 4th 1080 (1996).......................................................................................13

*Wright v. Fred Hutchinson Cancer Rsch. Ctr.*,
    206 F.R.D. 679 (W.D. Wash. 2002)...............................................................................9

*Zerilli v. Smith*,
    656 F.2d 705 (D.C. Cir. 1981) ...............................................................................6, 11

**U.S. Constitution**

    Amend. I....................................................................................1, 5, 6, 10, 11, 14

**California Constitution**

    Article 1, § 2(b) .......................................................................................5, 13, 15

**Federal Rules**

    Fed. R. Civ. P. 12 ...............................................................................................16
    Fed. R. Civ. P. 45 ..........................................................................................5, 15
    Fed. R. Civ. P. 45(d)(2)(B)(ii).............................................................................15
    Fed. R. Evid. 501..............................................................................5, 11, 12, 17, 18
    Fed. R. Evid. 501, Adv. Comm. Note, H.R. No. 93-650 (1974)....................11, 17

**California State Statutes**

    Cal. Evid. Code § 1070 .................................................................................5, 14
    Cal. Evid. Code § 1070(a)....................................................................................13

**Other Authorities**

Congressional Record, Volume 120, H12253-54 (daily ed. Dec. 18, 1974) ....................................12

*USA Today* "Six women reported a Louisiana college student for sexual misconduct. No one
    connected the dots." May 26, 2021 ................................................................16, 18

This Joint Statement concerns Journalist Kenneth Jacoby's November 13, 2023 Motion to Quash the subpoena with which he was served on October 31, 2023 by the Board of Supervisors of the University of Louisiana System ("ULS"), which is a defendant in *Jane Doe v. Board of Supervisors of the University of Louisiana System, et al.*, No. 22-cv-00338-BAJ-SDJ, pending in the U.S. District Court for the Middle District of Louisiana.

## I.   DETAILS OF MEET AND CONFER EFFORTS[1]

On November 15, 2023, counsel for Jacoby and Louisiana counsel for ULS conferred telephonically for one hour.[2]  ULS agreed to narrow the scope of the subpoena, which contains 28 document requests to non-party Jacoby, to include only the following (1) notes from conversations between Jacoby and Jane Doe from December 2018 to May 26, 2021; (2) text messages between Jacoby and Jane Doe from December 2018 to May 26, 2021; and (3) an affidavit from Jacoby authenticating copies of the production and providing a context for the production.  Counsel discussed withdrawing the subpoena if Jacoby would voluntarily provide the aforementioned materials and affidavit.  Jacoby prepared the attached declaration and proposed it to ULS on November 28, 2023.  ULS does not find that the declaration sufficiently addresses the content discussed and maintains its request for the three items noted above.  The opportunity for amicable resolution remains pending.

Jacoby is a professional journalist who, at all relevant times, worked for the newspaper *USA Today*.  His only connection to the underlying case is that he interviewed Jane Doe for a newspaper article.  Jacoby objects to even the narrowed subpoena, arguing it would violate his rights and privileges under the First Amendment, the California Constitution, and the common law not to be compelled to produce unpublished newsgathering materials.  Counsel for Jacoby explained these objections in a detailed letter and during counsels' two telephonic conferences.

---

[1] Meet and confer efforts are set forth in the accompanying Declaration of Catherine S. Giering, Louisiana counsel for the Board of Supervisors of the University of Louisiana System (ULS), and the Declaration of Jean-Paul Jassy, counsel for Kenneth Jacoby.

[2] Counsel also conferred telephonically on October 27, 2023 for approximately 45 minutes to discuss Jacoby's objections to a previous, substantively identical subpoena.  That subpoena was replaced by ULS to seek document production within the Eastern District of California, where Jacoby lives and works, and for service upon Jacoby's counsel.

1    ULS is one of the public university systems in the State of Louisiana.  For purposes of the

2    underlying matter, ULS encompasses University of Louisiana at Lafayette ("ULL") and Louisiana

3    Tech University ("Tech"), two of the universities implicated in not only Plaintiff Jane Doe's

4    allegations, but also in Jacoby's May 26, 2021, published piece in *USA Today*. Jacoby interviewed

5    Jane Doe for his article and included her story in the published article.  ULS asserts that the identity

6    of Jacoby's source and the published article are known.  ULS argues that information sought

7    provides context and temporal scope that is not available from any other source.  Under the

8    applicable federal common law, ULS has maintained its entitlement to this information.

9    **II.    THE NATURE OF THE ACTION AND THE FACTUAL DISPUTES**

10    Jacoby wrote a May 26, 2021 article published in *USA Today*, "Six women reported a

11    Louisiana college student for sexual misconduct. No one connected the dots."  ("the Article").  A

12    year after the Article's publication, Jane Doe, one of the women who reported Victor Daniel Silva

13    to ULS for assault, filed her lawsuit in the United States District Court for the Middle District of

14    Louisiana against ULS and others, asserting claims for Title IX and negligence under Louisiana

15    state law.  The Complaint credits the Article with making Doe aware of the facts underlying her

16    claims.  Jassy Decl. ¶ 3, Ex. 2.  ULS disputes this allegation, among others, and seeks discovery

17    from Jacoby to support its argument that Doe's claims are time-barred by the statute of limitations

18    (also referred to as "prescription" within the federal and state courts of Louisiana).  Jacoby contests

19    all discovery of unpublished newsgathering information on reporter's privilege/shield law grounds.

20    ULS contends that the information sought from Jacoby is discoverable under federal common law.

21    **III.    CONTENTIONS OF EACH PARTY AS TO EACH CONTESTED ISSUE AND**

22    **MEMORANDUM OF EACH PARTY'S RESPECTIVE ARGUMENTS**

23    **A.  Kenneth Jacoby's Memorandum of Arguments and Legal Authorities**

24    Kenneth Jacoby is a non-party journalist who wrote a carefully researched article published

25    by *USA Today* two and a half years ago that exposed a failure among universities and law

26    enforcement to protect unsuspecting women from a known serial predator: "Six women reported a

27    Louisiana college student for sexual misconduct. No one connected the dots."  *See* Jassy Decl. ¶ 2,

28    Ex. 1.  Now, a year and a half after Jane Doe brought a Title IX lawsuit against those institutions for

1    failing to protect victims from Victor Daniel Silva, Defendant ULS issued a sweeping subpoena

2    *duces tecum* to Jacoby.  Despite being informed that Jacoby's unpublished newsgathering materials

3    are protected under the reporter's privilege and shield laws, ULS insists on discovery from Jacoby

4    to explore their theory that Doe's claims are time-barred.  *Id.* ¶ 9.  After Jacoby filed this Motion,

5    ULS narrowed the 28 overly broad document requests to three categories: (1) notes from

6    conversations between Jacoby and Jane Doe from December 2018 to May 26, 2021; (2) text

7    messages between Jacoby and Jane Doe from December 2018 to May 26, 2021; and (3) an affidavit

8    of Jacoby authenticating copies of the production and providing a context for the production.  *See*

9    *id.*  ULS's statute of limitations theory contradicts Jane Doe's Complaint and deposition testimony,

10   where she testified that she learned of the facts underlying her claims only from reading the Article

11   when published on May 26, 2021.  The same argument from the same defendants that Jane Doe's

12   arguments are time-barred was already rejected by a Louisiana state court.  Jassy Decl. ¶ 14, Ex. 7.

13          The Subpoena directly contravenes Jacoby's rights as a journalist under the robust

14   protections of the U.S. Constitution, California Constitution, California state law, and the common

15   law.  Under Ninth Circuit law, compelled disclosure of unpublished newsgathering material is only

16   permissible "upon a showing that the requested material is: (1) unavailable despite exhaustion of all

17   reasonable alternative sources; (2) non-cumulative; and (3) clearly relevant to an important issue in

18   the case."  *Shoen v. Shoen* (*"Shoen II"*), 48 F.3d 412, 416 (9th Cir. 1995).  ULS cannot overcome

19   the privilege on this fishing expedition.  First, Jane Doe already produced text messages between

20   herself and Jacoby, which date no earlier than December 10, 2020.  Jassy Decl. ¶ 9(e).  Any

21   production of those same text messages from Jacoby would be cumulative, and Jacoby confirmed in

22   a sworn declaration that his December 9, 2020 email, December 10, 2020 phone call, and December

23   10, 2020 text messages were his first communications with Jane Doe.  Jacoby Decl. ¶ 3.[3]  Jacoby's

24   declaration resolves any uncertainty regarding the first dates and means of contact.  To the extent

25   ULS believes Doe has withheld any communications, that is a discovery issue to address directly

26

27   [3] ULS refused to provide copies of the texts produced to Jacoby but raised questions about first date
     and means of contact, which is what Jacoby's declaration intends to address.

28

with her.  Second, ULS did not pursue the alternative source of Jane Doe's phone provider until *after* Jacoby filed this Motion. Jassy Decl. ¶¶ 9(f), 11.  And they still have not exhausted that alternative source, nor do they claim to have done so.  Nor did ULS subpoena Jane Doe's accounts for cloud backup of the content of her text messages.  *Id.*  Third, ULS did not exhaust the alternative source of Jane Doe's emails by subpoenaing her email service provider.  *Id.*  Fourth, Jane Doe has consistently testified she first learned the facts underlying her claims from reading the published Article (not from communications with Jacoby prior to publication of the Article), including: the existence of Act 172, the law that bound the institutions to share information about sexual assault; the number of formal reports filed against Silva with universities and police departments; and the fact that Silva had used transfer/resignation to skirt accountability.  Jassy Decl. ¶ 13, Ex. 6, Tr. 91:8–99:18; 310:1–313:15; 324:16–325:12.  Fifth, when defense counsel asked Jane Doe if she knew about the contents in the Article or had seen a draft of the Article before it was published, she said no. Jassy Decl. ¶ 13, Ex. 6, Tr. 308:24–309:19.  Sixth, defense counsel did not exhaust their opportunity to directly question Jane Doe in her deposition to nail down each individual fact of what she learned and when she learned it.  *See id.*  Seventh, to the extent ULS could have asked Jane Doe additional questions to inform their statute of limitations argument, they did not. In fact, ULS's counsel ceded the witness to her co-counsel in the final seven minutes of a seven-hour deposition, and it was only then that the *other* attorney raised specific questions about what Jane Doe discussed with Jacoby and what Jane Doe first learned from the Article.  *See id.* Tr. 321:2–329:3.  Any further discovery on the topic would be cumulative, and ULS had its opportunity to exhaust that alternative source at Jane Doe's deposition.  Eighth, Jane Doe provided substantive responses about the underlying facts at her deposition – specifically including her conversations with Jacoby and her feelings of surprise and misplaced trust when she first learned while reading Jacoby's published Article that the officials she had reported to had not ultimately held Silva accountable – and her occasional "don't recall" answers related to date and time details otherwise verifiable through her document production.  *See id.*  In sum, ULS did not exhaust its alternative sources and seeks discovery from Jacoby cumulative with what it has obtained from Jane Doe to explore a legal theory that remains entirely speculative.  And because any discovery from Jacoby

1   would only serve to either corroborate or impeach Jane Doe's discovery, and there are no facts that

2   indicate Jacoby ever shared information with Doe to trigger the statute of limitations, discovery here

3   is not clearly relevant to an important issue in the underlying case.

4         Further, under California's state reporter's shield law, Jacoby is protected by an *absolute*

5   *immunity* in the civil litigation context, meaning no argument could overcome the state

6   constitutional protections of his unpublished newsgathering materials and confidential sources.  Cal.

7   Const., art. I, § 2(b); Cal. Evid. Code 1070.  Through federal common law and Federal Rule of

8   Evidence 501, the California Shield Law is relevant here because Jane Doe also brought state law

9   negligence claims in her underlying action.  In addition, the Subpoena is unduly burdensome to

10   Jacoby under Federal Rule of Civil Procedure 45.  It took Jacoby filing this Motion to Quash for

11   ULS to formally narrow its 28 overly broad requests.  *See* Jassy Decl. ¶¶ 8, 9(a), 9(b), Ex. 5.  As a

12   professional investigative reporter, Jacoby honors his commitments of confidentiality to his sources

13   for ethical, professional, and legal reasons.  He is particularly sensitive to protecting the contents of

14   communications with the sources here, survivors and whistleblowers of sexual assault.  Jacoby

15   Decl. ¶ 4.  For all these reasons, the Subpoena should be quashed, or in the alternative, a protective

16   order should issue that protects Jacoby from having to reveal any unpublished information.

**1. The Subpoena Seeks Unpublished Newsgathering Information Protected from Disclosure by the First Amendment**

19         While Jacoby's unpublished newsgathering materials are protected by several legal

20   doctrines, the most relevant here arises under the First Amendment.  Over a half century ago, the

21   United States Supreme Court in *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972), expressly

22   recognized that newsgathering activities qualify for First Amendment protection: "Without some

23   protection for seeking out the news, freedom of the press could be eviscerated."  *Id.*  The Ninth

24   Circuit[4] has held that *Branzburg* established a constitutionally based qualified privilege for

---

[4] Third-party subpoenas are assessed under the law of the jurisdiction enforcing them.  *Jimenez v. City of Chicago*, 733 F. Supp. 2d 1268, 1271 (W.D. Wash. 2010) (in a federal question case, applying Ninth Circuit, rather than Seventh Circuit, law invoking the reporter's privilege to grant a Washington state journalist's Rule 45 motion to quash while litigation proceeded in Illinois).

       JOINT STATEMENT

1  journalists to resist the disclosure of information gathered or obtained during the course of

2  newsgathering activities: "Rooted in the First Amendment, the privilege is a recognition that

3  society's interest in protecting the integrity of the newsgathering process, and in ensuring the free

4  flow of information to the public, is an interest 'of sufficient social importance to justify some

5  incidental sacrifice of sources of facts needed in the administration of justice.'" *Shoen v. Shoen*

6  (*"Shoen I"*), 5 F.3d 1289, 1292 (9th Cir. 1993) (internal citations omitted).  In holding that the

7  qualified privilege attached to subpoenaed, unpublished, non-confidential information obtained by a

8  book author, the Ninth Circuit stated: "the journalist's privilege recognized in *Branzburg* [is] a

9  'partial First Amendment shield' that protects journalists against compelled disclosure in all judicial

10  proceedings, civil and criminal alike." *Id.*   The "journalist's privilege applies to a journalist's

11  resource materials even in the absence of the element of confidentiality." *Id.* at 1295.  This

12  privilege reflects "the preferred position of the First Amendment and the importance of a vigorous

13  press." *Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. Cir. 1981); *see also id.* at 711 ("news gathering is

14  *essential* to a free press") (emphasis added).

15        These public policy concerns apply to the compelled disclosure of underlying resource

16  materials, such as notes and communications with sources, which is precisely the type of material

17  sought here.  *Shoen II*, 48 F.3d at 416; *Shoen I*, 5 F.3d at 1295; *United States v. La Rouche*

18  *Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988) ("We discern a lurking and subtle threat to

19  journalists and their employers if disclosure of outtakes, notes, and other unused information, even

20  if nonconfidential, becomes routine and casually, if not cavalierly, compelled").  This is due in part

21  to the fact that "court-enforced access to journalistic resources would risk the symbolic harm of

22  making journalists appear to be an investigative arm of the judicial system, the government, or

23  private parties." *Gonzales v. NBC*, 194 F.3d 29, 35 (2d Cir. 1999); *Shoen I*, 5 F.3d at 1294–95

24  (identifying a number of harms, including the risk of appearing as a "research tool" of the

25  government or private parties).  The Ninth Circuit has also recognized the substantial burden that

26  compliance with subpoenas can impose on reporters, noting that the "frequency of subpoenas would

27  not only preempt the otherwise productive time of journalists and other employees but measurably

28  increase expenditures for legal fees." *Shoen I*, 5 F.3d at 1295 (citation omitted).

The Ninth Circuit holds that the privilege applies broadly to protect both confidential *and non-confidential* material and information. *Shoen I*, 5 F.3d at 1295; *Shoen II*, 48 F.3d at 414. Disclosure of confidential information or non-confidential unpublished information may be compelled by a civil litigant "only upon a showing that the requested material is: (1) unavailable despite exhaustion of all reasonable alternative sources; (2) non-cumulative; and (3) clearly relevant to an important issue in the case." *Shoen II*, 48 F.3d at 416. *Shoen II* also requires that the party seeking to overcome the privilege "must [make] a showing of actual relevance; a showing of potential relevance will not suffice." *Id.* The three-part constitutional test under *Shoen II* is necessarily a "high hurdle against compelled disclosure from third party journalists." *Harbert v. Priebe*, 466 F. Supp. 2d 1214 (N.D. Cal. 2006). ULS cannot surmount that high hurdle.

### a.  ULS Has Not Exhausted Alternative Sources

Compelled disclosure from a journalist must be a "last resort after pursuit of other opportunities has failed." *Shoen I*, 5 F.3d at 1297 (quoting *Carey v. Hume*, 492 F.2d 631 (D.C. Cir. 1974)). In *United States v. Cuthbertson*, 651 F.2d 189, 196 (3d Cir. 1981), the Third Circuit held that the criminal defendants had not satisfied the element of proving that the "only practical access to the information" sought was from outtakes of interviews, noting that the defendants could "themselves interview these same interviewees, whose identity they know, to obtain the desired information." Similarly, in *New Jersey v. Boiardo*, 414 A.2d 14, 21 (N.J. 1980), the court quashed a subpoena served by a criminal defendant who sought letters written by one of the prosecution's witnesses to a journalist. The court's decision was based in part on the fact that the defendant had failed to show that the information contained in the letters was unavailable from other sources, even if the precise letters were not available from other sources. *Id.* at 23; *see also F. Marc Schaffel Prods., LLC v. TMZ Prods., Inc.*, No. CV-10-01306-GHK, 2010 WL 11549388, at *4 (C.D. Cal. Dec. 16, 2010) (reporter's privilege could not be overcome because the plaintiff had not yet exhausted alternative sources through depositions, declarations or other third party discovery); *Harbert*, 466 F. Supp. 2d at 1216 (rejecting motion to compel reporter's compliance with subpoena where subpoenaing party relied "only on the purported inadequacy" of party's discovery responses and did not show that "they ha[d] made other efforts to obtain [the] information"); *L.A. Mem'l*

1   *Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 489, 492–95 (C.D. Cal. 1981) (granting

2   reporters' motions to quash because of a failure to show an exhaustion of other means of obtaining

3   information).

4        Here, to the extent ULS does not already have the material they seek, *see infra* Section

5   III.A.1.b, they have not exhausted alternative sources for electronic communications between Jane

6   Doe and Jacoby.[5]  Without invading the reporter's privilege, ULS could subpoena and bring

7   motions to compel, if needed, against Jane Doe, phone company(ies), cloud backup account(s), and

8   email service provider(s) to confirm the dates and contents of communications between Jane Doe

9   and Jacoby.  *See* Jassy Decl.¶¶ 9(f), 11*see also* Jacoby Decl. ¶ 3 (already confirming dates and

10  means of first communications).  *See Carushka, Inc. v. Premiere Products, Inc.*, No. CV 87 02356

11  DT (JRX), 1989 WL 253565, at *3 (C.D. Cal. Sep. 1, 1989) (denying discovery where subpoenaing

12  parties "failed to make any motions to compel": "Defendants own oversight is not an adequate

13  reason to subvert the broad and substantial constitutionally-derived protections granted to"

14  subpoenaed media company).   ULS's unsupported theory that there may be other text messages

15  because Jane Doe received a new phone in 2020 is purely speculative.  *See id* ¶ 9(e); *see also*

16  Jacoby Decl.¶ 3.  As Jane Doe testified, she got her new iPhone with an iCloud backup account in

17  2020 and first communicated with Jacoby in 2020.  *See* Jassy Decl. ¶ 13, Ex. 6, Tr. 305:14–18 (first

18  contact at end of 2020); Tr. 322:9–25 (new iPhone 2020); *see also* Jacoby Decl. ¶ 3.

19       To the extent ULS claims they failed to resolve their factual questions when deposing Jane

20  Doe, they had the opportunity to exhaust that alternative source for seven hours.  Failure to pursue

21  proper discovery through deposition of the parties to the lawsuit does not overcome the reporter's

22  privilege.  *See e.g.*, *Shoen I*, 5 F.3d at 1296–98 (holding that plaintiffs who failed to take a

23  deposition before trying to penetrate the reporter's shield did not satisfy the threshold requirement

24  of exhaustion because they "failed to exhaust the most patently available other source"); *In re*

25  *Stratosphere Corp. Secs. Litig.*, 183 F.R.D. 684 (D. Nev. 1999) (denying plaintiffs' motion to

---

[5] Discovery from Jane Doe or from third parties does not waive Jacoby's privilege.  The reporter's privilege "belongs to the journalist alone and cannot be waived by persons other than the journalist."  *L.A. Mem'l Coliseum Comm'n*, 89 F.R.D. at 494.

compel the deposition testimony of a nonparty journalist because plaintiffs had not exhausted all

other reasonable sources of information sought, had not deposed all of the defendants, and had not

asked any defendant specifically about the article in question).  The specific information ULS seeks

is what Jane Doe learned from Jacoby and when, and Jane Doe is precisely the best alternative

source for that information.[6]  If ULS wants more time to depose Jane Doe, it can seek that relief.

Jacoby's notes and recollections are not the only source for this, and are, in fact, a lesser source than

admissions from the plaintiff herself.[7]

### b.  The Subpoena Is Cumulative with Other Discovery

Having already taken the deposition of Jane Doe and received document productions from

Jane Doe including all text messages with Jacoby, ULS's request here is cumulative.  Cumulative

information cannot reach the level of significance required to overcome the reporter's privilege.

*Shoen II*, 48 F.3d at 416.  Where a party to the lawsuit has already produced the materials sought

from the third-party journalist, such discovery would be cumulative.  *Wright v. Fred Hutchinson

Cancer Rsch. Ctr.*, 206 F.R.D. 679, 682 (W.D. Wash. 2002) (denying the defendants' motion to

compel in part because plaintiff had already produced materials sought).  ULS already has all the

relevant text messages, as produced by Jane Doe.  *See* Jassy Decl. ¶ 9(e).  Jane Doe has already

testified extensively about the substance of her communications with Jacoby.  *See* Jassy Decl. ¶ 13,

Ex. 6, Tr. 321:2–329:3.  Jane Doe has already confirmed that she did not see the Article before it

was published.  *See id.*  Tr. 308:24–309:19.  Critically, she has already testified as to what facts she

first learned when reading the Article after its publication.  *See id.*  Tr. 91:8–99:18; 310:1–313:15;

324:16–325:12.  All of the key communications and substantive topics ULS claims to need in

discovery from Jacoby have been produced or addressed in sworn testimony by Jane Doe.

---

[6] Because ULS's statute of limitations/"prescription" argument is limited to what *Jane Doe* knew and when, ULS's alleged recitation of any other third parties' purported testimony (*e.g.,* that of Andie Richard, another of Silva's victims) is irrelevant and violates the best evidence rule.

[7] This differs significantly from *Crowe v. County of San Diego*, 242 F. Supp. 2d 740 (S.D. Cal. 2003), which the ULS Board's counsel referenced during the conference of counsel.  In *Crowe,* plaintiffs' defamation claim arose from statements made in an aired television interview and the defendant sought the unaired interview footage to contextualize her statements as non-defamatory. *Id.* at 751.  There was no alternative source for the information in *Crowe*, but here there is Jane Doe.

JOINT STATEMENT

1

**c.  The Requests Are Not "Clearly Relevant" to a Specific Issue in the Case**

2    ULS only speculates and cannot show that the materials sought from Jacoby are "clearly

3    relevant to an important issue in the case." *Shoen II*, 48 F.3d at 416 (emphasis added).  The

4    documents and testimony ULS has obtained in discovery thus far all confirm what Jane Doe alleged

5    in her Complaint—that she learned the basis of her claims reading the Article.  *See* Jassy Decl. ¶ 3,

6    Ex. 2, Ex. 6 Tr. 91:8–99:18; 310:1–313:15; 324:16–325:12.  Indeed, a Louisiana state court has

7    already rejected ULS's "prescription" argument.  Jassy Decl. ¶ 14, Ex. 7.  As explained in *Shoen II*,

8    the party seeking to overcome the privilege "must [make] a showing of *actual* relevance; a showing

9    of *potential* relevance will not suffice."  48 F.3d at 416 (emphasis added).  It is not sufficient that

10   the information sought would be "useful."  *Krase v. Graco Children Prod.*, *Inc.*, 79 F.3d 346, 351

11   (2d Cir. 1996).  Instead, there must be a finding that the claim for which the information is to be

12   used "virtually rises or falls" on the admission of the materials.  *Id.*

13   There is no such strong showing here.  Instead, ULS is on a fishing expedition to explore if

14   Jacoby's notes will corroborate or impeach Jane Doe's testimony.  They seek discovery on whether

15   Jacoby may have revealed anything in interviews and communications with Jane Doe before May

16   26, 2021 that might have triggered the statute of limitations for her claims.  *See* Jassy Decl. ¶ 9(d).

17   But, the privilege may not be pierced on speculation that it will lead to impeachment evidence.[8]  *See*

18   *United States v. Fields*, 663 F.2d 880, 881 (9th Cir. 1981); *United States v. Burke*, 700 F.2d 70, 78

19   (2d Cir. 1983).  Even in criminal cases, and even when the information is non-confidential, the need

20   for privileged newsgathering information for purposes of impeachment generally is not sufficient to

21   overcome the qualified privilege.  *See, e.g.*, *Fields*, 663 F.2d at 881 (a pre-trial subpoena to a non-

22   party in a criminal case may not be used to gather evidence simply for possible impeachment); *see*

23   *also Burke*, 700 F.2d at 77 (holding that First Amendment-privileged materials were not subject to

24

---

25   [8] For example, courts reject subpoenas to journalists designed to elicit impeachment evidence.  *See*
     *Holland v. Centennial Homes, Inc.*, 22 Med. L. Rptr. 2270, 2275 (N.D. Tex. 1993); *New York v.*
26   *Troiano*, 11 Med. L. Rptr. 1896, 1899–1900 (N.Y. Sup. Ct. 1985) (asserted need for cross-
27   examination material inadequate to overcome privilege because not critical; applying federal and
     state journalist's privilege).

28

1    disclosure because criminal defendant failed to make a "clear and specific showing that

2    [subpoenaed] documents were necessary or critical to the maintenance of his defense").  Such

3    supposed inconsistencies are not "clearly relevant," *Shoen II*, 48 F.3d at 416, nor can they otherwise

4    be considered "crucial to [the] case," *Zerilli*, 656 F.2d at 713.

5           Nor has ULS treated discovery from Jacoby as a core issue to the case.  In the Complaint,

6    Jane Doe credited Jacoby's article with revealing to her the facts underlying her claims.  *See* Jassy

7    Decl. ¶ 3, Ex. 2.  Yet it was not until October 2023, at the tail end of discovery, that ULS began

8    pursuing any discovery from Jacoby.  *See id.* ¶ 4.  Similarly, Jacoby is only a minor character in

9    Jane Doe's deposition.  In the 329-page transcript of the seven-hour deposition, Jacoby's name only

10   appears on 21 pages.  The questions that ULS now claims are important enough to overcome

11   Jacoby's First Amendment rights were not even asked by ULS's counsel at the deposition.  As

12   detailed in the excerpted deposition transcript, it was *co-counsel* for ULS who first asked, in the

13   final seven minutes of the deposition, what Jacoby communicated to Jane Doe.  *See id.* Tr. 321:2–

14   329:3.  ULS chose to ask invasive questions about Jane Doe's assault, dating habits, poetry, and

15   emotional state but did not leave the time to delve into the details of her conversations with Jacoby.

16          **2.   Jacoby's Newsgathering Information Is Also Protected Under Common Law**

17          While the Ninth Circuit has recognized the qualified privilege as constitutionally based,

18   federal common law independently supports a journalist's privilege.  This privilege arises under

19   Federal Rule of Evidence Rule 501, which was adopted after *Branzburg* and provides in relevant

20   part that "privilege(s) … shall be governed by the principles of the common law as they may be

21   interpreted by the courts of the United States in the light of reason and experience."  Fed. R. Evid.

22   501.[9]  The House Report accompanying the 1975 adoption of Rule 501 explained that the federal

23   common law of privileges is "to be developed by the courts of the United States under a uniform

24   standard applicable both in civil and criminal cases."  Fed. R. Evid. 501, Adv. Comm. Note, H.R.

25   No. 93-650 (1974).  In *Jaffee v. Redmond*, 518 U.S. 1 (1996), the United States Supreme Court

26

27   [9] The underlying case arises under a federal question, Title IX, but also asserts state law claims, so
     state privilege law may also be relevant here.  Fed. R. Evid. 501.

28

established the framework for evaluating privileges under the federal common law.  As a guide to interpreting Rule 501, the Court referred to the "oft-repeated observation that 'the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions.'"  *Id.* at 8.[10]  The Second Circuit held that, "[a]bsent a federal statute to provide specific instructions, courts which must attempt to divine the contours of non-statutory federal law governing the compelled disclosure of confidential journalistic sources must rely on both judicial precedent and well-informed judgment as to the proper federal public policy to be followed in each case."  *Baker v. F&F Investment*, 470 F.2d 778, 781 (2d Cir. 1972).  For example, in *Los Angeles Memorial Coliseum Commission*, 89 F.R.D. at 492, a federal court in California held that, "under Rule 501, when a civil action in federal court contains a combination of federal and state claims or defenses, federal courts should evaluate claims of privilege under both state and federal law."[11]  *See also Carushka*, 1989 WL 253565, at *2 (applying both federal and state constitutional protections in case with federal and state claims).

     The Ninth Circuit directs federal district courts to look to state law for guidance when the State has directly addressed the issue.  *Gorenc v. Salt River Project Agric. Improvement & Power District*, 869 F.2d 503, 505 (9th Cir. 1989); *see also Jaffee*, 518 U.S. at 12–13 (same); *L.A. Mem'l Coliseum Comm'n*, 89 F.R.D. at 492 (same).  There is widespread consensus among the States regarding the existence and value of a journalist's privilege.  Forty states (including California), plus the District of Columbia, have codified the reporter's privilege.  Courts in nine additional states have recognized the journalist's privilege in at least some context in case law.  Jassy Decl. ¶ 5; Ex. 3 at 6–7.  The federal common law, as it looks to state law (here, California law), provides another

[10] The legislative history of Rule 501 – dating back more than forty years – anticipated that the law of privilege would evolve to recognize a journalist's privilege.  For example, the author of Rule 501 believed that the rule "permits the courts to develop a privilege for newspaperpeople on a case-by-case basis," and made clear that "[t]he language cannot be interpreted as a congressional expression in favor of having no such privilege, nor can the conference action be interpreted as denying to newspaperpeople any protection they may have from State newsperson's privilege laws." 120 Cong. Rec. H12253-54 (daily ed. Dec. 18, 1974).

[11] In *Crowe*, the court recognized how approaches differed on which privilege law should apply in federal question cases with pendant state law claims, but, generally, federal privilege law applies to federal claims, and state privilege law applies to state law claims.  242 F. Supp. 2d at 749–50.

1    avenue and layer of protection for Jacoby.  California law provides absolute protection against the

2    disclosure of any type of unpublished information from a journalist in a civil case.  *See infra*.

### 3.   Jacoby Is Further Protected Under California's Shield Law

4            In California, journalists are protected from having to disclose confidential sources and

5    unpublished, non-confidential information as codified in the California Constitution, Art. 1, § 2(b)

6    and California Evidence Code § 1070(a) (together, "California's Shield Law").  California's Shield

7    Law protects journalists from having to "disclose *any* unpublished information obtained or prepared

8    in gathering, receiving or processing of information for communication to the public." Cal. Const.,

9    art. I, § 2(b) (emphasis added).  Under the Shield Law, "unpublished information," which is

10   protected from disclosure in the face of a subpoena, includes ***any*** "information not disseminated to

11   the public by the person from whom disclosure is sought, whether or not related information has

12   been disseminated and includes, but is not limited to, all . . . data of whatever sort not itself

13   disseminated to the public through a medium of communication, whether or not published

14   information based upon or related to such material has been disseminated." *Id.*

15           California's Shield Law applies absolutely in civil cases, providing an "absolute immunity"

16   from contempt in civil cases, and "'***absolute*** protection to nonparty journalists in civil litigation

17   from being compelled to disclose unpublished information[.]'" *New York Times Co. v. Sup. Ct*, 51

18   Cal. 3d 453, 456–57, 461–62 (1990) (emphasis added; quoting decision from Court of Appeal,

19   which the Supreme Court affirmed); *see also McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97,

20   119–20 (2007) ("the Shield Law confers an absolute immunity against compelled disclosure of the

21   protected information and, although that immunity must occasionally yield when it threatens to

22   frustrate the competing federal constitutional right of a criminal defendant to a fair trial, there is no

23   analogous competing right of a civil litigant that will suffice to overcome the immunity").  "Since

24   contempt is generally the only effective remedy against a non-party witness, the California [Shield

25   Law] grant[s] such witnesses virtually absolute protection" in civil cases.  *Mitchell v. Sup. Ct*, 37

26   Cal. 3d 268, 274 (1984); *In re Willon*, 47 Cal. App. 4th 1080, 1091 (1996) (same).  Such protection

27   extends to Jacoby here.

28

1    Article 1, Section 2(b) of the California Constitution was enacted in 1980 by an

2 overwhelming majority of California voters.  By elevating the protection from a statute – Evidence

3 Code § 1070 – to the state constitution, the California electorate demonstrated their belief in the

4 need to give journalists the maximum possible shield for information obtained in their

5 newsgathering activities.  Recognizing this mandate, the Court of Appeal observed in *Playboy*

6 *Enterprises*, *Inc. v. Superior Court*, 154 Cal. App. 3d 14, 27–28 (1984), that the interests of the

7 press are favored over having civil actions determined on a full record:

8       "The elevation to constitutional status must be viewed as an intention to favor the
        interest of the press in confidentiality over the general and fundamental interest of
9       the state in having civil actions determined upon a full development of material
        facts. . . . It has long been acknowledged that our state Constitution is the highest
10      expression of the will of the people acting in their sovereign capacity as to matters
        of state law."

11      Where, as here, the material is sought by a civil litigant, there is no federal or state

12 constitutional right that can be weighed against Jacoby's rights under the California Constitution.

13 As the court noted in *Playboy*: "[c]ivil litigants do not have a constitutional right to unrestricted

14 discovery of relevant information."  154 Cal. App. 3d at 25; *see also McGarry*, 154 Cal. App. 4th at

15 119–20 (same).  Thus, in civil litigation, no balancing of opposing interests is appropriate because

16 California's Shield Law absolutely protects information from disclosure.  *Id.; New York Times*, 51

17 Cal. 3d at 462 (a civil litigant has no federal or state constitutional rights which are sufficient to

18 overcome rights under California Shield Law).

19      In *Los Angeles Memorial Coliseum Commission*, 89 F.R.D. at 495, a federal court granted

20 journalists' motions to quash subpoenas for their depositions and newsgathering materials, relying

21 in part on California's Shield Law, which, the court held, "'reflect[s] a paramount public interest in

22 the maintenance of a vigorous, aggressive and independent press capable of participating in robust,

23 unfettered debate over controversial matters, an interest which has always been a principal concern

24 of the First Amendment.'"  *Id.* (quoting *Baker*, 470 F.2d at 782).

25      Under California's Shield Law, Jacoby has an ***absolute*** constitutional right not to disclose

26 "***any*** unpublished information obtained or prepared in gathering, receiving or processing of

27 information" in this civil case, and ULS has no competing constitutional right that could overcome

28

-14-                                                                    JOINT STATEMENT

1   Jacoby's rights.  Cal. Const., art. I, § 2(b) (emphasis added); *New York Times*, 51 Cal. 3d at 456–57,

2   461–62; *McGarry*, 154 Cal. App. 4th at 119–20; *Playboy*, 154 Cal. App. 3d at 25.  This absolute

3   rule applies "whether or not published information based upon or related to such material has been

4   disseminated."  Cal. Const., art. I, § 2(b).  That absolute bar applies here.

5         **4.  The Subpoena Would Impose an Undue Burden on a Non-Party Journalist**

6         Finally, the Subpoena would subject Jacoby, a non-party journalist, to an undue burden, in

7   violation of Federal Rule of Civil Procedure 45.  While ULS did ultimately narrow its 28 overly

8   broad requests, it took filing this Motion to get them to do so.  Jassy Decl.¶ 9(a), (b).  Further, the

9   time, effort, and resources to review and collect the relevant information – including but not limited

10   to the significant burden imposed by the need to review and redact documents under a restrictive

11   protective order in the underlying case – unduly burden Jacoby as a non-party. The law bars the

12   discovery that ULS seeks.  For these reasons the Subpoena to Jacoby should be quashed, or in the

13   alternative, a protective order should issue.[12]

14         **B.  ULS Board's Memorandum of Arguments and Legal Authorities**

15         **1.  Overview of ULS's Position**

16         The Board of Supervisors of the University of Louisiana System ("ULS") is a named

17   defendant in a suit filed in the United States District Court for the Middle District of Louisiana,

18   captioned *Jane Doe v. Board of Supervisors of the University of Louisiana System, et al.*, No. 3:22-

19   cv-00338-BAJ-SDJ ("underlying Doe suit).[13]   The factual allegations that form the basis of

20   Plaintiff Doe's suit occurred from approximately 2015-2018.  However, Doe did not file her suit

21   until May 25, 2022.  As part of its defense, ULS argues that Doe's claims are prescribed and are

22   time-barred by the applicable statutes of limitations.[14]

---

23   [12] ULS Board's counsel threatened to seek sanctions against Jacoby for asserting his constitutional
24   rights.  Jassy Decl. ¶ 9(a).  If anything, the ULS Board should be required to pay Jacoby's fees.  *See*
     Fed. R. Civ. P. 45(d)(2)(B)(ii); *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013);
25   *Nitsch v. DreamWorks Animation SKG Inc.*, 2017 WL 930809 (N.D. Cal. Mar. 9, 2017).

26   [13] *See* Compl. at ¶ 1 filed by Doe on May 25, 2022, attached to Giering Decl., as Ex. ULS-1.

     [14] In Louisiana, "prescription" is a doctrine analogous to the concept of statutes of limitations in
27   other jurisdictions.  Thus, a claim that is "prescribed" in Louisiana courts is untimely and time-
     barred, as under a statute of limitations.

28

---

The *Doe* Complaint asserts the doctrine of *contra non valentum* in anticipation of Defendants' objection to the timeliness of her suit. These allegations were asserted in a preemptive manner in anticipation of Defendants' challenges brought under Federal Rules of Civil Procedure Rule 12.  Specifically, Doe alleges that she learned, for the first time, material facts that form the basis of her lawsuit when she read an article written by Kenneth Jacoby and published in *USA Today* on May 26, 2021. [15]  Thus, Doe has placed at issue the contents of Jacoby's article as well as the timing of her knowledge about the then forthcoming article.

ULS has engaged in extensive discovery to obtain information that may support its defense that Doe's claims are time-barred.[16]  Even though Doe claims she did not have knowledge of the facts that form the basis of her lawsuit until the date she read Jacoby's article, Doe has now testified that she spoke or corresponded with Jacoby on multiple occasions about the article before it was published. However, Doe has been unable or unwilling to provide information that shows (1) what she discussed with Jacoby in his preparation of the article, and (2) when these discussions about the material facts published in the article took place.[17]

This information is relevant because it is central to ULS's prescription defense and its ability to prepare for trial. Doe has already testified that she has no information to establish what was discussed in her communications with Jacoby or the timeline of those communications. Because Doe and Jacoby were the only parties to those communications, Jacoby is the only available source of this information. Accordingly, for the reasons outlined below, this Court should issue an order compelling Jacoby to produce the materials responsive to the narrowed scope of ULS's subpoena.

---

[15] *See* "Six women reported a Louisiana college student for sexual misconduct. No one connected the dots." *USA Today*, published May 26, 2021, attached to Giering Decl. at ¶ 4, as Ex. ULS-2.

[16] ULS files exhibits in support of this pleading pursuant to the Consent Protective Order and Confidentiality Agreement, filed into the record of the underlying Doe suit as R. Doc. 51, and attached to the Giering Decl. as Ex. ULS-3.

[17] *See* e.g., excerpts of Jane Doe Dep. at 305, 307, 324, and 327-328, attached to Giering Decl. as Exhibit ULS-4.

1

    **2.  Applicable Law -Federal Common Law Governs Production of Materials**

2

          **Pursuant to ULS's Subpoena**

3

      ULS's subpoena to Jacoby was issued in connection with the underlying *Doe* suit. In her

4

Complaint, Doe asserts claims under federal law (Title IX) and Louisiana state law (general

5

negligence).[18] In response to the subpoena, Jacoby asserted privileges under California state law.

6

However, Federal Rule of Evidence 501 provides that federal common law should govern the issue

7

presented in the instant matter —whether ULS's subpoena should be quashed.

8

      Rule 501 states as follows:

9

10

    The common law--as interpreted by United States courts in the light of reason and experience--governs a claim of privilege unless any of the following provides otherwise:

11

          • the United States Constitution;
          • a federal statute; or

12

          • rules prescribed by the Supreme Court.
    But in a civil case, state law governs privilege regarding a claim or defense for

13

    which state law supplies the rule of decision.

14

Fed. R. Evid. 501. "The first sentence of Rule 501 establishes that federal common law generally

15

controls evidentiary privileges in cases arising under federal law," and "[t]he second sentence

16

requires district courts to apply state law in cases governed by state law." *F.D.I.C. v. Fidelity &*

17

*Deposit Co. of Maryland*, 196 F.R.D. 375, 379 (S.D. Cal. 2000).

18

      When a case addresses mixed claims of both federal and state law, federal law should apply.

19

In *Harbert v. Priebe*, 466 F. Supp. 2d 1214, 1215 (N.D. Cal. 2006), the party claiming application

20

of California state law argued the reporter's privilege should apply because six of the ten claims at

21

issue asserted California state law claims for relief. The Court ruled: "However, in light of the fact

22

that their case asserts federal claims, the Court applies federal privilege law pursuant to Rule 501."

23

*Id.; see also Agster v. Maricopa Co*., 422 F.3d 836, 839 (9th Cir. 2005) ("Where there are federal

24

question claims and pendent state law claims present, the federal law of privilege applies."); Fed. R.

25

Evid. 501, Advisory Comm. Notes.

26

27

---

[18] *See* Compl., attached to Giering Decl. as Ex. ULS-1.

28

1      Federal courts in Louisiana, where the underlying action was filed, reach the same result.

2   *See Porter v. Dauthier*, No. CIV.A. No. 14-41-JWD-RLB, 2014 WL 6674468, at * 2 (M.D. La.

3   Nov. 25, 2014) ("In cases involving federal and state claims, when the requested evidence relates to

4   both the state and federal claims and the privilege rules conflict, courts have generally applied

5   federal privilege law.")

6      As stated above, Doe asserts claims under both federal and Louisiana law. No claims are

7   asserted under California law. The evidence requested in the subpoena relates to Doe's state and

8   federal claims in Louisiana. Accordingly, Federal Rule of Evidence 501 provides that federal law

9   applies, not California state law.

10      **3.   Jacoby Should Be Compelled to Produce Materials Pursuant to the Subpoena**

11      The journalist's privilege recognized under federal law is qualified, not absolute. The Ninth

12   Circuit holds that when, as here, "the information sought is not confidential, a civil litigant is

13   entitled to requested discovery notwithstanding a valid assertion of the journalist's privilege by a

14   nonparty only upon a showing that the requested material is: (1) unavailable despite exhaustion of

15   all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue

16   in the case." *Shoen v. Shoen*, 48 F.3d 412 (9th Cir.1995) ("*Schoen II*"). As outlined below, all three

17   elements are established in this case such that ULS's right to the requested discovery trumps any

18   assertion of the journalist privilege.

19      Here, Jacoby wrote an article entitled, "Six women reported a Louisiana college student for

20   sexual misconduct. No one connected the dots." ("the Article").[19] Doe admitted during her

21   deposition that she is the woman in Jacoby's article who alleges she was assaulted by Victor Daniel

22   Silva at Louisiana Tech University. Thus, she is a known source, and her confidentiality is not at

23   issue. During her deposition, Doe identified Jacoby as a source for the factual assertions included in

24   her lawsuit. For example, Doe's Complaint alleges that it was a "fluke" that an administrator at the

25   University of Louisiana-Lafayette ("ULL," part of ULS) learned about Silva's prior arrest in Baton

26

27   [19] *See* "Six women reported a Louisiana college student for sexual misconduct. No one connected the dots." *USA Today*, published May 26, 2021, attached to Giering Decl. as Ex. ULS-2.

28

Rouge for sexual misconduct.[20] When asked about her support for this allegation, Doe testified as follows:

> Q: Okay. So you don't have any information independently?
> A: Independently, no.
> Q: Okay. Thank you.
>     Your complaint goes on to say that "certainly not through any formal notification from LSU or its Title IX office."
>     Do - - what do you mean by "formal notification"?
> A: Again, this is information that I do not have independently or firsthand. This is information that I received from Kenny Jacoby, the journalist, and my attorney.
> Q: Okay. What evidence do you have that ULL never followed up with LSU or Baton Rouge law enforcement for additional information concerning Silva?
> A: I can only speak to what I experienced with Ruston PD and Louisiana Tech University. That's information that Kenny Jacoby and my attorney would have known.[21]

ULS issued the subject subpoena to determine when Doe obtained this information from Jacoby and what topics of the article Doe and Jacoby discussed before the article was published.

In his preparation of the article, Jacoby interviewed and/or spoke with several women who claimed Victor Daniel Silva assaulted them. ULS recently deposed Andie Richard, one of the women identified in the article.[22] Richard confirmed that she communicated with Jacoby in preparation of his article. Initially, Jacoby informed Richard that his story was focused on Louisiana State University's handling of complaints about Silva.[23] However, Jacoby later advised that his article also addressed other universities in the state and how they handled complaints about Silva.  Richard also testified that she participated in an interview with Jacoby approximately three months before the article was published, at which time these issues were discussed.

---

[20] *See* Compl. at ¶5, attached to Giering Decl. as Ex. ULS-1.

[21] *See* e.g., excerpts of the Deposition of Jane Doe at pg. 93, ll. 5-25, attached as Exhibit ULS-4.

[22] Richard was deposed on November 17, 2023. At the time of the filing of this pleading, a copy of the transcript from her deposition was not yet available.

[23] See copy of message, attached to Giering Decl. as Ex. ULS-5, sent from Jacoby to Andie Richard on December 9, 2020, in which Jacoby reaches out to Richard, identifies himself as a reporter, and advises of his investigation into alleged mishandling of sexual assaults at LSU, including identification of assault allegations asserted against Silva.

1   ULS recognizes that Doe and Richard are different witnesses. However, because Doe and

2   Richard were both sources for the article, Defendant anticipates that Jacoby provided both sources

3   with similar information about the contents of his article. Stated differently, evidence shows Jacoby

4   provided Richard with background information about his investigation and identified universities in

5   Louisiana he believed to be involved with the issues ultimately published in his article. Defendant

6   suspects Jacoby, whom Doe had never met, provided Doe with similar context for their

7   communications. But Doe claims she cannot recall what information Jacoby gave her when they

8   spoke:

9    Q:   When Kenny Jacoby contacted you, did he identify himself as a journalist
          with USA Today?
10   A:   Yes.
     Q:   Okay. He told you that he was investigating a story about Victor Daniel
11        Silva?
12   A:   Yes.
     Q:   Okay. Did he - - and he told you that's what led him to you?
13   A:   Yes. I - - believe so.
     Q:   How did he find out about you?
14   A:   As I'm sitting here right now, I - - I don't recall how - -[24]
     Q:   Did you ask him?
15   A:   - - how he - - how he found out about me.
     Q:   Just answer the question, the last question I asked.
16   A:   I - - I don't recall, as I'm - - as I'm sitting here, if I asked him. Yeah, I don't -
17        - I don't recall.[25]

18   Unlike Richard, Doe testified that she could not recall with any specificity the details about

19   her communications with Jacoby.

20   Q:   What was communicated between yourself and Kenneth Jacoby?
     A:   You know, I don't recall exactly what it was. I know that we focused on - -
21        he asked me for my experience, and I - - I told him. So that was - - that's
          what we focused on.
22   Q:   Okay. Did he provide you with any information?
23   A:   As I'm sitting here right now, I - - I don't recall, yeah.

24   [24] It is now known that Andie Richard referred Jacoby to Jane Doe, which further supports ULS's
     anticipation that Doe not only communicated with Jacoby around the same time frame that he
25   communicated with Richard, but that he also likely provided the same context and information to
     Doe. Both the timing and content of these communications are relevant and important to ULS's
26   defense regarding the untimeliness of Doe's claims.

27   [25] *See* excerpts from the Deposition of Jane Doe at pg. 327, ln. 16- pg. 328, ln. 14, attached as
     Exhibit ULS-4.

28

Q:      Okay. Is it possible that he might have provided you with information.

A:      It's possible.[26]

While evidence shows that Doe spoke with Jacoby about the issues addressed in his article some time before the article was published,[27] Doe is unable to recall whether she discussed the material facts relevant to Jacoby's article before it was published. Therefore, in light of Doe's inability to provide the information essential to ULS's time-bar defense, Jacoby is the only source from whom this information can be obtained.

Accordingly, ULS issued the subject subpoena to Jacoby. In conversations with Jacoby's counsel, ULS agreed to narrow the scope of the subpoena at issue to requests for (1) notes from conversations between Jacoby and Jane Doe from December 2018 to May 26, 2021; (2) text messages between Jacoby and Jane Doe from December 2018 to May 26, 2021; and (3) an affidavit from Jacoby authenticating copies of the production and providing a context for the production.[28] Importantly, ULS does not ask Jacoby to identify a confidential source. Doe's identity is known. ULS is also not asking Jacoby to produce information that Doe asked to be withheld from publication or information obtained from any other sources with whom he spoke or contacted for the article. Rather, ULS requests production of information that identifies the subject matter/content of Doe's communications with Jacoby —issues ultimately included in Jacoby's published article, and information similar to that obtained from Richard during her deposition. It also seeks production of information that shows when Doe obtained information from Jacoby about the issues ultimately included in his article.

---

[26] *See* excerpts from the Jane Doe Dep. at pg. 324, ll. 3-15, attached as Exhibit ULS-4.

[27] *See* e.g., excerpts from the Jane Doe Dep. at pgs. 304-309, attached to Giering Decl. as Ex. ULS-4.

[28] On November 28, 2023, a Declaration of Kenneth Jacoby was presented to counsel for ULS for the first time.  The declaration does not satisfy the narrowed scope of the subpoena for multiple reasons, including: (1) Jacoby cannot attest that he understands that ULS has all communications as that is not accurate and not based upon his independent knowledge; (2) Jacoby references a December 9, 2020 email, which has not been produced and for which he provides no content; (3) Jacoby references a December 10, 2020 telephone conference with Doe without any content; and (4) the declaration does not address any communications beyond December 10, 2020, which are known to exist.  Because of these issues, the limited scope remains unsatisfied, and ULS cannot accept the proposed declaration.

1    In a case similar to the circumstances here, *Crowe v. Cnty. of San Diego*, 242 F. Supp. 2d

2  740 (S.D. Cal. 2003), the court applied the test set forth in *Schoen II* and found that the federal

3  journalist's privilege did not apply to preclude discovery of a videotaped interview. In *Crowe*, the

4  defendant issued a subpoena to obtain a videotaped interview from CBS Broadcasting, Inc. recorded

5  in support of a report that aired on "48 Hours." The aired portion of the video lasted three minutes,

6  but the entirety of the video lasted approximately three hours. *Id*. at 743. The defendant requested

7  production of the entire video to defend the defamation claims asserted against her. CBS asserted

8  the reporter's privilege at issue in this case in response.

9    The Court in *Crowe* found the video was clearly relevant to the underlying case because it

10  would provide context and content of the statements made to the reporter during the interview. This

11  information was relevant to the defendant's primary defense to the plaintiff's claim. *Id*. at 751. The

12  Court also found that the videotape was the only source available to obtain the precise content of the

13  subject interview, which was needed to defend the claim at issue. *Id*. Further, the evidence was

14  noncumulative because no other evidence existed to show the precise content and context of the

15  communication at issue. *Id*. at 752. Thus, the Court held the journalist's privilege could not apply

16  under *Schoen II*.

17    In similar fashion, the same result should follow here. As outlined below, ULS's request

18  meets the test for production set forth in *Schoen II* such that this Court should order Jacoby to

19  comply with the subpoena

20                    **a.  The requested information is unavailable from other sources**

21    Defendant here seeks production of documents from Jacoby to include notes from his

22  conversations from December 2018 to May 26, 2021, text messages he exchanged with Doe from

23  December 2018 to May 26, 2021, and an affidavit authenticating the production and providing

24  context for the production.[29] The only potential sources of this information are Doe and Jacoby.

---

[29]  In discussions with Jacoby's counsel, an affidavit of Jacoby was suggested in lieu of his deposition in order to provide context, temporal scope, and authentication for the limited materials ULS seeks in production. The affidavit was also suggested before the discovery deadline in the underlying matter was extended. ULS has since issued a subpoena and Notice of Deposition for Jacoby, to occur on December 14, 2023, via Zoom.

Because Doe claims she is unable to recall when she spoke with Jacoby or what information Jacoby provided her about his investigation during their conversations and/or interviews for the article, Jacoby is the only source from whom the requested information can be obtained.

ULS issued discovery requests to Doe on September 25, 2023, to obtain copies of her written communications with Jacoby. On November 6, 2023, Doe responded with a limited production in response to ULS's request.[30] The production contained copies of text conversations from December 10, 2020, February 9, 2021, April 22, 2021, and May 26, 2021. Review of these text messages reveals references to additional communications not included in the production.[31]

Recently, ULS received evidence that Jacoby also messaged Andie Richard, another source for his article, on December 9, 2020. In that message, Jacoby identified himself as a reporter and advised of his investigation into alleged mishandling of sexual assaults at LSU, including identification of assault allegations asserted against Silva.[32] Defendant issued its subpoena to assess whether similar communications were sent to Doe. However, citing Jacoby's assertion of privilege at issue in this pleading, Doe refused additional production of her written communications with Jacoby. Thus, Jacoby is the only reasonable source from whom Defendant can obtain the requested information, meeting the first *Schoen II* factor.[33]

### b.  The requested information is not cumulative

The information Defendant requests in its subpoena is not cumulative of any other information available or that has been produced in discovery. As outlined above, Doe and Jacoby

---

[30] *See* copies of Text Messages, attached to Giering Decl. as Ex. ULS-6.

[31] On November 18, 2023, Doe produced a copy of another message she received from Jacoby, in which Jacoby expresses interest in talking to Doe about her claims. *See* Giering Decl., Ex. ULS-5. However, the message is not dated, and ULS cannot obtain the date of this message from any source other than Jacoby.

[32] *See* Giering Decl., Ex. ULS-5.

[33] In fulfillment of its good faith efforts to exhaust all other possible discovery, ULS also issued a subpoena to Verizon (Doe's phone provider) to obtain Doe's phone records. In the subpoena, Defendant requested copies of text messages exchanged between Doe and Jacoby. However, based upon experience and case law, it is expected that documents produced in response to the Verizon subpoena will show only the dates and times text messages were sent and received, not the contents of the text messages exchanged between Doe and Jacoby. Accordingly, the requested materials only can be obtained from Jacoby.

JOINT STATEMENT

are the only sources of the requested information. Doe testified she cannot recall the substance of the communications she had with Jacoby before his article was published. Thus, the requested information would not be cumulative of any evidence obtained through witness testimony in this matter.

ULS's request for Jacoby's notes and copies of his communications with Doe is not cumulative. Doe testified she may have exchanged emails with Jacoby.[34] Doe also testified she got a new phone and lost access to communications that may have been responsive to Defendant's discovery requests.[35] Defendant has attached to this pleading all communications between Doe and Jacoby that it has obtained through discovery. The attachments confirm that Doe exchanged text messages with Jacoby, and because of the references made in those text messages, the attachments confirm there were additional communications and conversations that were not produced. Thus, production of any communications between Doe and Jacoby that are not attached to this pleading would not be cumulative of other evidence obtained in this matter. Accordingly, the second *Schoen II* factor is met.

### c. The requested materials are clearly relevant to an important issue in this case

Undeniably, whether Doe's claims are time-barred or "prescribed" is a critical issue in the underlying case. The information requested in the subject subpoena is clearly relevant to this issue because it can establish when Doe obtained knowledge of the material facts supporting the claims asserted in her Complaint.

In her Complaint, Doe raised certain factual allegations for the express purpose of claiming her suit was **not** time-barred or prescribed. ULS is entitled to conduct discovery to obtain information to support its defenses to this claim.

Doe claims she learned about the material facts that form the basis of her lawsuit, for the first time, when she *read* Jacoby's article on May 26, 2021.[36] Thus, Doe agrees that the material

---

[34] *See* Jane Doe Dep. at 305-308, attached to Giering Decl. as Ex. ULS-4.

[35] *See* Jane Doe Dep. at 109, 122 attached to Giering Decl. as Ex. ULS-4.

[36] *See* Compl. at ¶10, attached to Giering Decl. as Ex. ULS-1.

facts presented in the article form the basis of her suit. Doe also testified that she spoke with Jacoby about the article, exchanged written communications with Jacoby about the article, and conducted an interview with Jacoby about issues published in the article *before* the article was published.[37] However, Doe claims she is unable to recall what was discussed in her conversations with Jacoby or what information Jacoby provided her during their discussions about his investigation.

ULS issued the subject subpoena to obtain this information so that ULS may analyze the overlap between the information published in Jacoby's article and the information discussed in Doe's communications with Jacoby before the article was published. This information will allow Defendant to establish a timeline for when Doe obtained knowledge of the material facts that she claims form the basis of her lawsuit. This information is essential to ULS's defenses in this case and is clearly relevant to the issue of whether Doe's claims are time-barred or prescribed, satisfying the third *Schoen II* factor.

### 4. Summary of ULS's Position

Jacoby's compliance with the subpoena, as narrowed and agreed upon, should be compelled because the information sought is: (1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case.

/ / /

---

[37] *See e.g.*, Jane Doe Dep. at 305-308, attached to Giering Decl. as Ex. ULS-4.

1   DATED:  November 29, 2023          JASSY VICK CAROLAN LLP

2

3                                                /s/  Jean-Paul Jassy

4                                                JEAN-PAUL JASSY
                                                 Counsel for Moving Party and
5                                                Non-Party Journalist
                                                 KENNETH JACOBY
6

7   DATED:  November 29, 2023        /s/ Vickie P. Whitney (as authorized on November 29, 2023).

8

9                                                *Vickie P. Whitney*

10                                               ROB BONTA
                                                 Attorney General of California
11                                               JULIE A. MALONE
                                                 Supervising Deputy Attorney General
12                                               VICKIE P. WHITNEY
                                                 Deputy Attorney General
13

14                                               AND

15                                               KEOGH, COX & WILSON, LTD.

16                                               *Catherine Giering*
                                                 ANDREW BLANCHFIELD*
17                                               Louisiana State Bar No. 16812

18                                               CATHERINE GIERING *
                                                 Lousiana State Bar No. _26495
19                                               *Pro Hac Vice Admission Pending*

20                                               *Attorneys for Respondent*
21                                               BOARD OF SUPERVISORS OF THE
                                                 UNIVERSITY OF LOUISIANA SYSTEM
22

23

24

25

26

27

28